UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

UNITED STATES OF AMERICA, )
) Case No.
Plaintiff, ) 4:26-cr-00117
)
vs. )
)
SCOTT BERNARD GANN, )
)
Defendant. )

---

**TRANSCRIPT OF DETENTION HEARING**
**ELECTRONICALLY RECORDED PROCEEDINGS**
**BEFORE THE HONORABLE ZACK HAWTHORN**
**UNITED STATES MAGISTRATE JUDGE**

**January 14, 2026**
**Plano, Texas**

---

APPEARANCES:

For the Government:

MR. PAUL MORRIS
U.S. Attorney's Office - Sherman
600 East Taylor Street, Suite 2000
Sherman, Texas 75090
paul.morris@usdoj.gov

For the Defendant:

MR. MICHAEL J. PANNITTO
Federal Public Defender's Office
600 East Taylor Street, Suite 4000
Sherman, Texas 75090
mike_pannitto@fd.org

*******************************************

APRIL HARGETT, CSR, RPR, RVR
Federal Official Court Reporter
300 Willow Street
Beaumont, Texas 77701

# I N D E X


**WITNESSES FOR THE GOVERNMENT:** **PAGE**

**MICHAEL LARRAZOLO**
Direct Examination by Mr. Morris 5
Cross-Examination by Mr. Pannitto 25

**WITNESSES FOR THE DEFENDANT:** **PAGE**

**SARA FAHERTY**
Direct Examination by Mr. Pannitto 32
Cross-Examination by Mr. Morris 38

**ASHLEY LORANTZ**
Direct Examination by Mr. Pannitto 40

**LATRENA LAMPKIN**
Direct Examination by Mr. Pannitto 44
Cross-Examination by Mr. Morris 48


* * *

January 14, 2026 11:47 a.m.

---oOo---

ELECTRONICALLY RECORDED

PROCEEDINGS

---oOo---

THE COURT: Thank you. Please be seated.

The Court calls Case No. 4:25-mj-417 styled *United States of America v. Scott Bernard Gann*.

We're set this morning for a detention hearing.

Is the government ready?

MR. MORRIS: Good morning, your Honor. Paul Morris on behalf of the United States. The government is ready.

THE COURT: Good morning. Has the government received a copy of the pretrial services report?

MR. MORRIS: The government has, your Honor.

THE COURT: Other than any witnesses you'd like to call or evidence you'd like to submit, are there any suggested corrections you'd like to make to the report?

MR. MORRIS: No, your Honor. The government the last time we were in court last week at least noted what might be a discrepancy of monthly income of $400,000. And so I -- that just jumps out to me as

being different. But reading the report, I have no corrections to suggest, your Honor.

THE COURT: Monthly income of 400,000?

MR. MORRIS: Yes, your Honor. On Page 1.

THE COURT: Okay.

MR. MORRIS: It's, rather, Page 2 under the defendant's box.

THE COURT: Okay. Same basic questions to you, Mr. Pannitto. Have you received a copy of the pretrial services report?

MR. PANNITTO: I have.

THE COURT: Other than any evidence you'd like to submit or witnesses you'd like to call, are there any suggested corrections you'd like to make to the report?

MR. PANNITTO: No, your Honor.

THE COURT: Okay. All right. The Court will take judicial notice of the pretrial services report. The Court will also keep that under seal. Because this is a contested hearing, the Court will not regard the recommendation of the pretrial services office at this time.

Does the government have any witnesses?

MR. MORRIS: The government does, your Honor.

THE COURT: Okay. You can call your first

witness, please.

MR. MORRIS: Yes, your Honor.

The government calls to the stand FBI Special Agent Michael Larrazolo.

THE COURT: Okay. Can you raise your right hand for me, please?

(Witness sworn.)

THE WITNESS: I do.

THE COURT: Thank you. Have a seat. Make sure you speak into the microphone for me, please.

Thank you.

**MICHAEL LARRAZOLO, GOVERNMENT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

**BY MR. MORRIS:**

**Q.** Would you please state your name for the record spelling your last name?

**A.** Michael Larrazolo, last name spelled L-a-r-r-a-z-o-l-o.

**Q.** You're here on a criminal complaint of -- or an incident that occurred on December the 17th of last year. I want to ask you questions regarding the defendant's risk of being in the community himself and also the risk of flight for the events that happened before December 17th, on December 17th, and after December 17th.

Starting with before December 17th, how did -- did the defendant have a case that was ongoing in the Eastern District of Texas?

**A.** Yes.

**Q.** And can you describe for the judge what that was?

**A.** It was a civil case involving tax liens -- a complaint for tax liens that the -- for the subject not paying his taxes.

**Q.** And was the amount that at least alleged to be owed approximately $890,000 in a tax lien?

**A.** Yes.

**Q.** And with interest, was the amount approximately 1.2 million?

**A.** That's correct.

**Q.** And is that Civil Case No. 4:24-cv-00277?

**A.** Yes, it is.

**Q.** Who is presiding over that case?

**A.** Judge Amos Mazzant.

**Q.** Is he currently presiding over that case?

**A.** He was up until the -- these events had occurred.

**Q.** And based on these events -- and you're speaking of -- what are these events?

**A.** Threats that were made to the court officials involved with that civil case.

**Q.** And based on that threat, Judge Mazzant recused

himself in the civil case?

**A.** Yes.

**Q.** Okay. On April 8th of 2025, did the United States file a motion to appoint a receiver to sell the defendant's property?

**A.** Yes, they did.

**Q.** And where was that property at?

**A.** 4803 South -- it's in Parker, Texas.

**Q.** In Parker, Texas. And did Judge Mazzant rule on that motion?

**A.** Yes, he did.

**Q.** And was that on June 12th, 2025?

**A.** That is correct.

**Q.** Do you recall, without going into the details, but the basic gist of what the judge's motion granted? What was his order?

**A.** That order was to appoint a receiver, as well as vacate the premises.

**Q.** And how long did -- for who to vacate the premise?

**A.** For Mr. Gann, family members, associates, anybody affiliated or in that residence.

**Q.** And the judge also gave him an opportunity to take any personal property out of it as well during that time?

**A.** Correct. There was 30 days, according to that

order.

**Q.** And so if I'm understanding the timeline, the defendant had until July 12th of 2025 to remove himself, any family members, and any property from that Parker home address?

**A.** That's correct.

**Q.** Okay. Did the defendant do that?

**A.** It did not appear so.

**Q.** And then what do you base that on?

**A.** According to a statement that was provided by the court-appointed receiver, upon their first survey walk-through for the home on July 12th -- on or about July 12th, as they went into the residence, her statement -- and, basically, it was found to be that -- it appeared somebody was still living there. She saw a firearm, had moved that. The gentleman who was escorting her -- with her on that survey walked through as he was -- as he was continuing to walk through the rest of the residence came upon Mr. Gann sleeping in a room. And they immediately exited the residence with Mr. Gann apparently yelling at them and chasing them out of the house.

**Q.** And was he demanding to -- where his gun was?

**A.** Yes.

**Q.** So -- and remind us all, what is a receiver? What

is a court-appointed receiver?
**A.** So a receiver is essentially a real estate agent that has been authorized by the Court to take possession of the property, put it in condition for sale, market it appropriately just like any other home sale, authorized to make any repairs, and put it into condition so it's saleable.
**Q.** Did the receiver after this interaction with the defendant return to the property and again try and execute what she's supposed to be doing, selling the house?
**A.** Correct.
**Q.** Did this happen on September 16th?
**A.** On September 16th, yes.
**Q.** And she did -- did this receiver do that in conjunction with Parker Police, U.S. Marshals that day?
**A.** Yes. The U.S. Marshal Service SWAT team, as well as the Parker Police Department were coordinated to physically remove Mr. Gann from the residence.
**Q.** So I understand what you're saying, the SWAT team was employed in order to have Mr. Gann comply and leave the residence?
**A.** As I understand it, yes.
**Q.** Okay. What happened, if anything, on that date, September 16th, 2025? Did Mr. -- did the defendant have

any interaction with the receiver?

**A.** Limited in -- in conjunction with the U.S. Marshals that were escorting her who had to walk her -- with her through the property.

**Q.** And was there -- what was Mr. Gann's -- if you recall from the receiver's statement, what was his demeanor like?

**A.** According to the statement, he was extremely agitated. And in her interactions with him, it's always been an agitated, aggressive, and condescending demeaning tone in the way that he spoke to her and the other folks there.

**Q.** And then do you recall the receiver providing exactly what Mr. Gann said that he -- who he was and what he was going to do to her at that time? And I'm referring to the receiver's statement -- I'd like to show that here. I've provided it to defense counsel. Would that help you refresh your recollection?

**A.** Yes, it would.

MR. MORRIS: Your Honor, may I approach?

THE COURT: Yes.

**BY MR. MORRIS:**

**Q.** Go ahead.

**A.** As far as their interaction?

**Q.** Yes.

MR. MORRIS: I've handed the witness -- for the record, your Honor, I've handed the witness the statement by the receiver. Again, that has been provided to defense counsel.

**BY MR. MORRIS:**

**Q.** Does reading that refresh your recollection?
**A.** Yes, it did.
**Q.** And then was there an interaction between Mr. Gann and the receiver?
**A.** Yes.
**Q.** And what was that?
**A.** Aggressive, interactive saying that she was wrong, they weren't supposed to be there, basically denying that they had any access to the property.
**Q.** Did anything -- did Parker Police take any action against the defendant on that September 16th --
**A.** They provided a notice of trespass.
**Q.** So he was criminally trespassed from that property?
**A.** Yes.
**Q.** Okay. Did the defendant -- to the best of your knowledge, did he return to the property?
**A.** After -- after September 16th, yes.
**Q.** Was there an incident on October 7th of 2025?
**A.** Yes.
**Q.** What happened on that date?

**A.** The -- in preparation for the estate preparation and sale of goods that were on the property -- while that was getting arranged, the estate sellers that were contracted by the receiver ended up being chased off by Mr. Gann. He had again showed up to the property and was very aggressive and apparently chased them off once again.
**Q.** Now, on the -- going forward to December the 16th, did the Department of Justice file a motion with the Court in the civil proceeding to sell property and a show cause?
**A.** Yes. A motion was filed.
**Q.** And did Judge Mazzant rule on that motion?
**A.** He did. He basically signed that order and it was filed on December 17th.
**Q.** And then what was in that order? Was it an order to sell the property and a show -- and for a show cause hearing for the defendant be held in contempt?
**A.** Correct. And an order to approve the sale of the property, which had been completed, and the order was therefore issued, as well as a show cause order for filing of lis pens by Mr. Gann.
**Q.** And for -- in common nonlegal -- what does that mean? A lis pens or what was the -- the attempted -- what was the reason for doing that, as best as you can

recall, or why did the judge have a show cause hearing?

**A.** Essentially, it affects the ownership and the -- what is the stated ownership of the house. But that was clearly stated as an issue -- an action not authorized in the original court order where it was decided upon that the issue to vacate -- and they were not supposed to take any such actions that would impede, interfere with the sale, preparation, any of the things that the receiver was doing. And then filing that motion in the Court, the show cause order was basically for Mr. Gann's counsel to show cause why that lis pens would apply and why they should not be held in contempt of court by that order.

**Q.** That order happens on 12/17. We're going to go through the sequence of events on 12/17. What else happened on 12/17?

**A.** On 12/17, Mr. Gann had later in that day, approximately 3:00 -- 3:24 p.m., had gone to a Ray's gun store and had purchased ammunition -- 9-millimeter caliber ammunition, one box, and two magazines for a 9-millimeter pistol.

**Q.** Okay. Do you recall if he also reached out to a friend saying that he would hear about him on the news?

**A.** Yes. So a friend contacted Parker Police Department to say that his friend, Mr. Gann, had called

him half an hour earlier, which is probably around 3:15 p.m., and had said he was going to go buy some ammo for his gun and he would hear about him on the news.

**Q**. Did the defendant at some point reach out to law enforcement after buying that ammo?

**A**. Yes. At approximately 3:50 p.m. or shortly thereafter, he contacted Parker Police Department, spoke with Chief Kenneth Price, and had a conversation with him for approximately half an hour.

**Q**. Was that conversation recorded?

**A**. Yes, it was. It was recorded by body-worn cameras at the police department.

**Q**. And does that conversation -- is it a conversation between the Parker police chief and the defendant?

**A**. That's correct.

**Q**. And does the defendant, you know, just fast forwarding, later acknowledge that that was him calling the Parker police chief?

**A**. Yes.

**Q**. Okay. And can you give an overview of -- how many calls were there in total?

**A**. Two total calls.

**Q**. Can you give an overview of that first call and what statements, if any, did the defendant make that were concerning?

**A.** On that first call, Mr. Gann had -- was yelling, was pretty upset, and Chief Price was trying to talk very calmly with him and tried to understand what his issue was. Mr. Gann was saying that they took his house, stolen his house, they've taken all of his belongings. He's going to sue the federal government. In that -- as part of that conversation, he continues to say he's going to make a stand like the Alamo. He's going to -- he also threatens the police officers, if any show up. Don't send your police officers, to the Parker police chief. He's better shots than they are. He's locked and loaded. Just several comments.

He also directed statements that he will -- he would plan a -- he was going to go to her house -- and believed he was referencing the -- the receiver -- and would kill her in front of her children. He was going to kill her. And in later parts of the conversation, he was also mentioning essentially anybody that showed up related to this -- basically don't because he's going to shoot -- he's going to be shooting -- he's going to be shooting people.

**Q.** Okay. And then at around the 9:35 mark of that, did he make a threat towards Judge Mazzant?

**A.** The threat was he could go to the judge's house and kill him.

**Q.** And can you give the -- I know it's already in the affidavit of the complaint, but the specifics -- you have that in front of you. The specific, as best as you have, the language that he used?
**A.** Yes. I can reference that. It's Paragraph 7 of the affidavit. "You are going to my house and you execute me or I am going to the judge's house and fucking killing him or I am going to this bitch that sold all my shit and killing her and her family, so I'm going to my house, I'm doing the honorable thing of those three choices."
**Q.** Moving on to the -- you said there was a second phone call. Do you recall who initiated that phone call? And was that, again, to Parker chief of police?
**A.** Correct.
**Q.** Okay. And do you recall any threatening or certain statements that were made by the defendant in that call?
**A.** Yes. Again, the defendant had continued to warn the police chief do not send any of his officers. He didn't want to hurt anybody, but he was going to do what he had to do. He had also made reference to loading a weapon. He was loading a magazine -- what sounded like loading a magazine. He specifically asked the chief if he used a particular kind of device to load his magazines, load his ammo. And the chief replied, "No."

And Mr. Gann was specifying, "So you load them by hand one at a time?" And the chief responded, "Yes." He laughed. And -- but it clearly sounded on the other -- as you could hear what he was doing on the other line -- on his end of the line, it did sound like rounds were being loaded into a magazine.

**Q.** Did he say that he's -- did the defendant say, "I'm locked and loaded and I'm better than everybody that works for you"?

**A.** He did. I believe that was in the first phone call.

**Q.** In that first phone call, did he say, "Tell JP, hey, Gann man's got this, he's going to kill everybody"?

**A.** Yes.

**Q.** In that second phone call, did he make an additional statement and threat against the receiver at 17:09?

**A.** Yes.

**Q.** What did he say?

**A.** "I'm defending my shit. If anyone comes back to my house, you need to tell them I will kill -- I'm going to have them -- my lawyers tell the judge that anybody who walks on my -- on my fucking property, I will execute them." He, again, later at 17:16, I want to know if she goes back up to his house because Gann man is going to

execute her ass and is going to have her lawyers tell her again that someone -- he is going to execute her ass if she walks back on my property.

**Q.** And then at some point, did he say to the chief of police, "You hear that? That's me discharging the ordinance out of a 1911"?

**A.** Yes. Toward the end of the call as the chief is trying to get him to show up, talk over at the police station, and Mr. Gann is saying, no, he's better now, and -- but the police chief is continuing to let him know, like, we need -- we need to address this in person. Mr. Gann's like, no, I'm good. I'm leaving. In fact, you know what -- and specifically states: "Listen up" -- and this is at the 38:07 mark in the recording -- "Listen up" -- a click like the action of a pistol is in the background -- "you hear that? That's me discharging the fucking ordinance out of the 1911."

**Q.** Did the Parker chief of police -- what did he do in response to these threats?

**A.** He was contacting and attempted to contact Allen Police Department. The -- he was going to need tactical support with the way the conversation was going. So actually as he was on the phone with Mr. Gann and getting one of his officers ready to call Allen, the Allen chief of police actually called the -- Chief Price

at Parker Police Department to let him know that, hey, Mr. Gann made some concerning statements when he was in Allen at a restaurant visiting with the mayor. And Allen Police was letting him know that, hey, this -- Mr. Gann is -- sounds like he's going back to his place and you may have an issue. And the Parker police chief said, "Yeah, I'm on the phone with him now." And -- and basically saying he's talking pretty violent right now. He's making a lot of threats. I may -- I may need some support, some assistance. If you could have your SWAT team ready, that would probably be helpful, or words to that effect.

And Allen PD was -- the police chief was also offering those resources and anything else he needed, but he advised he would place his SWAT team on stand-by, which he -- which the chief of Allen Police did confirm in a later interview.

**Q.** At some point, U.S. Marshal Service and FBI is notified of these threats?

**A.** Correct. Parker Police Department had notified the U.S. Marshal Service because of the previous interactions that they've had and -- and in assisting on the enforcement of those court orders and the eviction process. And with the threats that were being made -- so they made contact with the U.S. Marshal Service.

**Q.** And did the -- and the U.S. Marshal Service obviously notified -- did they notify anybody in regard to these threats that were happening?
**A.** They notified the parties that were involved with this civil case involving Mr. Gann. So they notified the judge, Judge Mazzant, his chambers, the DOJ attorney, Mr. Michael May, and the court-appointed receiver.
**Q.** And during that first 24, 48 hours, is it fair to say there is an effort to mitigate the threat, you know, with the victims and also gather information?
**A.** Yes. To verify the threat -- what the threat was, listen to the recordings, and determine that a threat was actually indeed present.
**Q.** And we talked before about a statement that the receiver gave. Did you have an opportunity to review that statement?
**A.** I did.
**Q.** And --
**A.** I have it.
**Q.** And in that statement, does the receiver -- does she talk about the impact that this threat has had on her life?
**A.** Yes.
**Q.** And can you just briefly share that for the judge?

**A.** Yes.
**Q.** And it doesn't have to be verbatim, but how seriously did she take that threat?
**A.** Essentially, they had to change their family routine. It was around the holidays, so they had to cancel some parties that they were planning on attending. They were also not -- they were advised not to stay at their home that night. And the next day, they were advised continue to stay away from your home, find alternate lodging. They didn't tell them where to stay, but the receiver did have to find another place. I know she just took the time -- a very short time to pack her children's belongings, some clothes for being away for a couple of days, and then they were planning on going on a foreign trip a few days after that. So they just basically did not return to the house to stay overnight. And so this was an extreme inconvenience.
And they were obviously in fear for -- she was in fear for her life and as well as her family's safety, based off the threats that were presented to her from the Marshal Service. And they were advised by the Marshal Service to take those measures.
**Q.** Based on the entirety of the threats, was there a complaint filed in the Eastern District of Texas on 12/23?

**A.** Yes.
**Q.** Was the defendant arrested on 12/25?
**A.** Yes, he was.
**Q.** Was the defendant subsequently mirandized and interviewed?
**A.** Yes, he was.
**Q.** And in that, did he admit to having firearms?
**A.** Yes. He was interviewed by the Marshal Service on or about the 28th of December. And during that interview with the U.S. Marshals, Deputy U.S. Marshal Zitner (phonetic) interviewed him. He had acknowledged that he did have firearms.
**Q.** In the entirety of the interview, was there a part in there where he talked about what he could still do -- he still saw himself as the rightful owner of this home and what he could do to this home?
**A.** Yes. He advised he could still burn that house down and he could do it from the street, he could have somebody do it for him, he could do that, he's that smart.
**Q.** In regards to the defendant's criminal history, have you had an opportunity to look at his -- his past or any interactions with law enforcement?
**A.** Yes.
**Q.** And has there been any, from your review -- if you

could cite any, history of noncompliance with law enforcement or the courts?
A. Specifically as of March 4th, 2022 -- let me make sure that date is correct. He -- he was charged with driving while intoxicated, evading arrest, detention with a vehicle, as well as a -- he was arrested under an outstanding still active warrant for violation of a protective order. And during that process of the -- of the vehicle stop, which was initiated by Allen PD for -- for expired tags that were still showing 2016 --
Q. What year?
A. -- that he had displayed on the vehicle.
Q. What year was that interaction with law enforcement?
A. This was the same year, 2022.
Q. Okay.
A. From that same incident. And that's what initiated Allen Police Department to try to effect a traffic stop for those expired tags. Mr. Gann did not stop after activated lights, sirens, continued to follow him. He did not stop and acknowledge the law enforcement attempting to make that traffic stop. He took them all of the way to his residence, drove into his garage thinking the police officer -- basically thinking that he was under the assumption that that would make him

safe and not have to answer to law enforcement.

They just were not getting any response from him. So they followed him into the garage. As he was trying to close the garage, the police officer in attempting to stop him from fleeing any further and basically creating a possible barricade situation, the law enforcement officer ended up having to call for assistance. He -- there were several units that were en route in support of this incident. And at the same time in trying to get Mr. Gann to comply, Mr. Gann was not complying. He had to threaten use of a taser. With -- with another officer's assistance, they were able to get him to the ground to get him in compliance.

As he was going through processing and being placed under arrest, he was stating he didn't know that law enforcement was behind him. He had no idea they wanted him to stop. If they -- they should have asked him please if they wanted him to comply. He just thought that was an acceptable request that -- if they wanted him to comply, they should have said please. As determined and as stated by the arresting officers, he was combative, aggressive, and noncompliant.

MR. MORRIS: Nothing further. The government passes the witness.

THE COURT: Okay. Mr. Pannitto.

MR. PANNITTO: Thank you, your Honor.

**CROSS-EXAMINATION**

**BY MR. PANNITTO:**

**Q.** Good afternoon.
**A.** Good afternoon, sir.
**Q.** So just to be clear, you weren't present for any of these interactions?
**A.** That is correct.
**Q.** What you know, you know from reviewing other people's reports?
**A.** From our investigation, yes, sir.
**Q.** And viewing videos?
**A.** Correct.
**Q.** Okay. Now, you talked about a letter that you read from the receiver. Is it true that in that letter, Mr. Gann said that -- she said that he told her he was going to report her to the Texas Real Estate Commission?
**A.** Yes. He had stated that.
**Q.** To try to have her license revoked?
**A.** Yes.
**Q.** And that's because he felt what was happening was not warranted under the law?
**A.** I believe that would be his -- his reason, but --
**Q.** And when he was interviewed, he talked about the things that happened to him. And he, at one point, said

one of the -- one of the Department of Justice guys lied to the judge?
**A.** He had stated that.
**Q.** And all of that was arguably to show that he was right and they were wrong in the pending action?
**A.** Which pending action?
**Q.** The action regarding his house and the tax statement and the fact that they were seeking his house -- he felt that the actions that were taking place were not based on the law, they were based on lies that someone told to the judge at some point?
**A.** At what point of the case, I am not aware. Other than if it was after the orders that were already issued, that's -- those orders were pretty clear from the Court.
**Q.** All right. So would you agree that the tone of his conversation with the chief was that he was treated wrongfully in the dispossession of his house?
**A.** I would say that he was not understanding that the house was already lost. It's gone. And he's still trying to stand for something that he is -- seemed to me was in denial that this process had been taken place and has already been effected.
**Q.** And do you recall him asking the chief, "How do I address this?" and the chief saying, "You should get --

you should get the news involved"?
A. He had mentioned that he was going to have the news coming over first. And so the chief, as I recall, agreed, okay, that's one way you could do it.
Q. And did the chief say you should try to get ahold of your friend Bebe and maybe he could help you with getting the news?
A. Yes.
Q. And, I mean, generally speaking, all of this is to bring attention to his complaint that he was dispossessed based on a lie, according to him?
A. According to him, that could be possible, yes.
Q. And you've mentioned some of the things that he said. It's some of the things you said -- the calls were about two hours, right?
A. Over an hour, yes, sir.
Q. There's a lot being said. There's a little bit of back and forth. But at different points, he's -- he said, "I didn't go to their houses. I went to my house."
A. The -- during which conversation?
Q. Well, there were two calls to the chief?
A. Yes.
Q. During one of those calls -- well, let me try to clean things up for you a little bit here. I've got

three transcripts that talk about the calls. And I'm going to withdraw the previous question and ask about things you read out of the transcript just to make things clear.

So on the transcript with the last five numbers 38836, did he say, "I cannot believe what just happened" -- and the -- left out a word. "I'm coming to my house instead of going to her house killing her and her family. I'm not doing that because I'm an honorable man." Do you recall him saying that on the --

**A.** Yes.

**Q.** -- audio tape? And later on, on that same tape, he says, "I'm not going to her house and killing her, which is if I was a true criminal, I would be doing." Do you recall that?

**A.** He did say that, yes.

**Q.** Okay. And do you recall him saying, "I promise you another thing, I'm not going to her house to kill her tonight, that's two promises I make"?

**A.** Yes. He specifically -- not going to her house to kill her tonight.

**Q.** And then did he say, "Chief, I didn't go in the house. I'm not shooting anybody. We've got to agree to that stuff." And then he said, "them M" -- then a word that starts with the letter F -- "she'll back off, I

want you to know that"?
A. Correct. And he did state that he had gone up to the house. And by order, he wasn't even supposed to be on the property.
Q. Right. But he said he'd take the misdemeanor, he just wanted to see what was, in his words, stolen from his house?
A. Yes. That, as he understood, the misdemeanor charge, which would be on the state side.
Q. Did he say, "I didn't say I was going to shoot the judge. I went to college with him"?
A. He said that.
Q. And nearing the end of the conversation, did he say, "I'm not going to kill anybody. I'm not built that way"?
A. He stated that.
Q. And did he also say, "I'm not going to go do shit inappropriately"?
A. I don't recall that --
Q. Do you have --
A. -- specifically.
Q. -- transcripts in front of you?
A. I don't have a transcript of the call.
Q. I'm going to show you what I'm going to mark as Defense Exhibit 1. For identification purposes, it's

the report of investigation with the last five numbers 39507.

Do you recognize that?

**A.** Yes.

**Q.** And what is that?

**A.** That is him as he's trying to depart.

**Q.** Okay. It's kind of a transcript of what he's saying to the chief?

**A.** Correct. A transcript of that call -- portions of that call, yes.

**Q.** Okay. And during that call, did he say -- and I can't remember if I asked this already or not -- "I'm not going to kill anybody. I'm not built that way"?

**A.** Yes, he said that, too.

**Q.** And did he say, "I'm not going to go and do shit inappropriately"? Did he say that?

**A.** Yes.

**Q.** And did he say, "So, Chief, go home, don't worry about me, I'm the last" -- word that starts with F -- "guy you have to worry about. I am" -- a word -- same word -- "rational, perfect, and no problems, you understand?"

**A.** He stated that as well.

**Q.** And then did he say, "I'm pissed about everything, but I'm not -- I'm not burning the house down. I'm not

killing anybody in it"?

**A.** Yes.

**Q.** And did he say, "It's all good. My lawyers are on it"?

**A.** Words to that effect, yes.

MR. PANNITTO: I have nothing further.

THE COURT: Any redirect?

MR. MORRIS: No, your Honor. Thank you.

THE COURT: All right. May this witness be excused?

Did you want to admit that into the record or that was just for identification purposes?

MR. PANNITTO: I just wanted to refresh his recollection, Judge. I'm fine with it not being a part of the record at this point.

THE COURT: Okay. Thank you, sir. You can be excused.

Any other witnesses you'd like to call?

MR. MORRIS: No more witnesses, your Honor. And then other than the content of the pretrial services report and the affidavit and the complaint, the government has nothing further.

THE COURT: Okay. I will take judicial notice of the affidavit attached to the complaint. I don't think I did that earlier.

Any witnesses you'd like to call, Mr. Pannitto?

MR. PANNITTO: I do, your Honor. I have basically three young ladies here today.

THE COURT: All right.

MR. PANNITTO: They are going to testify to both the character of the defendant for peacefulness, as well as take on joint responsibility for being third-party custodians so that he's never alone.

THE COURT: Okay. Before you have a seat, can you raise your right hand for me, please?

(Witness sworn.)

THE WITNESS: Yes.

THE COURT: Thank you. Have a seat. Make sure you speak into the microphone, please.

**SARA FAHERTY, DEFENDANT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

**BY MR. PANNITTO:**

**Q.** Can you please state your name?

**A.** It is Sara Faherty.

**Q.** Okay. Could you spell that for the record?

**A.** Sure. Last name is spelled F as in Frank, a-h-e-r, T as in Tom, Y.

**Q.** And, Sara, is there someone here in court that you know?

**A.** Yes. Mr. Gann.
**Q.** Okay. And you've heard a lot of talk about the things that happened on December 17th and September and October. Is that the Scott Gann that you know?
**A.** No, it's not.
**Q.** Can you tell me about the Scott Gann that you know?
**A.** Scott and I have known each other for ten years now and never had that kind of an exchange between ourselves or between anyone.
**Q.** So you've never seen him violent with anyone?
**A.** No.
**Q.** You've never seen him threaten anyone?
**A.** I have not.
**Q.** Have you ever seen him brandish a weapon?
**A.** Absolutely not.
**Q.** When's the last time you ever saw him with a weapon in his hand?
**A.** I have actually never seen a weapon in his hand. We did move some pieces from his home to my home, which is where he's staying currently. And there were weapons that came along with artwork and some other things. But he never took them out of the case.
**Q.** Did you know that his father was a brigadier general?
**A.** Yes. I knew he had some military in his

background.
**Q.** And were you ever told that some of those weapons were war, kind of, souvenirs or things to remember his father by?
**A.** I think one of them was his father's weapon, yeah.
**Q.** So he kept some collection of weapons? You don't know the origin of all of them, but one of them was his father's?
**A.** Yes. That was before my time of knowing him.
**Q.** But you've known him for ten years?
**A.** Uh-huh.
**Q.** And in those ten years, what is your opinion of him as being a dangerous person?
**A.** I have never seen him be -- I would never use the word "dangerous" about him. We have spent probably every night having dinner -- literally picking me up at work. We'll have dinner almost every night in those ten years. I don't know how many times we were apart other than my business trips that I might take. And it's always been fun. He always tried to lift me up. I work a lot. And he's always been jovial, everyone around us seems to like him. I don't know any of his friends from Parker.
**Q.** Yeah. But you've been in a restaurant with him? You've been in other places with him?

**A.** Absolutely.

**Q.** And have you ever heard anyone say he's a dangerous person?

**A.** No. He's always a "yes, ma'am, no, sir" type.

**Q.** Have you ever had anyone say you better stay away from him he may hurt you?

**A.** Not in front of me.

**Q.** So, generally, you've never heard any negative comments from the people that you all associate with in the community that you live in and apparently go to dinner at about him being a dangerous person?

**A.** Absolutely not. They look forward to him coming, actually.

**Q.** Now, the other group of questions I want to ask you about is -- you heard the testimony, right?

**A.** Yes.

**Q.** And there's some words that he said on that day apparently while he was upset that are concerning. Would you agree?

**A.** Yes. It was hard to hear.

**Q.** And the judge or anyone else would want to make sure that before he's let out there's some sort of way that he could be kept an eye on to make sure that he did not do anything. Do you have a home?

**A.** Yes.

Q. And where is that home?
A. It is in Oak Cliff, Kesseler Park.
Q. And do you live there by yourself?
A. Yes, sir.
Q. And do you have a place for him to live --
A. Yes.
Q. -- in your home? And are you okay with him coming to live with you?
A. Yes.
Q. And if he were to live with you, could you make sure that he didn't possess any weapons?
A. Absolutely. They're not in the house currently.
Q. Okay. Could you make sure that he didn't drink alcohol?
A. Yes.
Q. If the Court decided that he should take some classes or assess any other things on him, an evaluation or whatever, would you be able to make sure that he got to that appointment?
A. Absolutely.
Q. Now, you work, correct?
A. Yes, sir.
Q. And that's a 9:00 to 5:00 job?
A. It is not. I work in retail.
Q. So it could -- your hours could change?

**A.** Yes.
**Q.** But you've talked to other people here in court?
**A.** Yes. There's a friend of ours named LaTrena that would be able to help and basically lives down the street.
**Q.** Okay. And is there a person named Rachel who you've also talked to about this case?
**A.** Yeah. Rachel couldn't be here today.
**Q.** And is his sister here in court?
**A.** She is in court, yes.
**Q.** Okay. And between the three of you, have you talked about a way to make sure that he's never alone?
**A.** We can definitely make that happen between all of us.
**Q.** You all are close enough together?
**A.** Yes.
**Q.** You all are -- apparently care about him enough to make sure that he doesn't do anything to jeopardize his freedom?
**A.** Yes, sir.
**Q.** And if he did drink alcohol or you saw him with a firearm, would you call the authorities immediately?
**A.** I would have no problem doing that.
**Q.** Okay. And if you had to go out of the house even for ten minutes, would you call LaTrena or his sister or

Rachel?
**A.** Yes.
MR. MORRIS: I have no further questions, your Honor.
THE COURT: Any cross?

**CROSS-EXAMINATION**

**BY MR. MORRIS:**
**Q.** There's a lot of conversation about alcohol. The defendant does drink alcohol regularly, right?
**A.** Yes.
**Q.** And you've observed that yourself?
**A.** Yes.
**Q.** And you've at times observed the defendant drink alcohol in excess; is that right?
**A.** At some points, yes.
**Q.** And at those times, were you able to stop the defendant from drinking in excess?
**A.** I was.
**Q.** Did he drink to excess?
**A.** No. And I would not be able to tell you what excess is for somebody.
**Q.** Did you tell -- do you remember an interview that you had with the pretrial services officer?
**A.** The lady who phoned me?
**Q.** That's correct.

**A.** Uh-huh.
**Q.** And do you remember her asking you whether the defendant drank alcohol in excess?
**A.** I answered her and I said, yes, and on occasion.
**Q.** Okay. On the -- you heard what you called -- or what you said was hard to listen to in terms of what the defendant was saying on 12/17, right?
**A.** Yes.
**Q.** And on 12/17, did the defendant call you?
**A.** No.
MR. MORRIS: Okay. I have no further questions.
THE COURT: Any redirect?
MR. PANNITTO: No, your Honor. Thank you.
THE COURT: Thank you, ma'am. You can have a seat.
Call your next witness, please.
Hi. Can you raise your right hand, please?
(Witness sworn.)
THE WITNESS: I do.
THE COURT: Thank you. Have a seat. Make sure you speak in the microphone for me, please.

**ASHLEY LORANTZ, DEFENDANT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

**BY MR. PANNITTO:**

**Q.** So can you please state your name for us?
**A.** Ashley Lorantz.
**Q.** And you've known the defendant longer than anyone, right?
**A.** Yes. 52 years.
**Q.** And why is that?
**A.** Because he's my brother.
**Q.** Okay. Now, you've heard the questions that I asked Sara. I'm going to ask you similar questions. You heard the testimony here today, right?
**A.** Yes.
**Q.** In your -- what was it --
**A.** Fifty-two, yes.
**Q.** I thought it had to be in the forties, right?
**A.** I wish.
**Q.** Anyway, in your time knowing him, have you ever seen him violent?
**A.** No.
**Q.** Have you ever seen him threatening anyone with a weapon?
**A.** No.
**Q.** Have you ever seen him threatening anyone?

A. No.
Q. How would you describe him? Like, what is his character since you've known him 52 years?
A. He's jovial. He's encouraging. He's loving. He's respectful. He's polite. You know, our -- we grew up in a military family, and, you know, the values we were taught were to respect authority--
Q. Okay.
A. -- and to really admire the people who protect our country.
Q. And some of that -- your growing up, you were a lot of different places because your father was a brigadier general, right?
A. Yes.
Q. And what places were you in?
A. Working backwards from his retirement, we were in Panama -- Panama Canal. We were in Guam; Omaha, Nebraska; North Dakota; Georgia; North Carolina; Alabama; San Antonio. A lot of different places. We moved every couple of years.
Q. And when y'all finally came to Texas --
A. Uh-huh.
Q. -- and Scott bought his house here. He found his home, right?
A. That's right. There was a real sense of putting

down the roots, finally.
**Q.** And he -- and he loved that home, right?
**A.** He did love it.
**Q.** And inside of that home, he had possessions?
**A.** Yes.
**Q.** Some were heirlooms like his mother's Christmas decorations and his father's war memorabilia?
**A.** Yes. Some antiques. Our grandparents were antique dealers and there were some special antiques as well.
**Q.** Did he have a disabled daughter?
**A.** Yes. Does.
**Q.** And did he have a trust that was established for her well-being?
**A.** Yes. That's correct.
**Q.** And when this whole process happened, did he ever mention to you how upset he was that his daughter would be losing access to that which would provide for her throughout her life?
**A.** Yes, he did.
**Q.** Now, you heard what I asked Sara about will you all work together and she's going to volunteer her house for him to be there all of the time. And you're going to come over if she needs a break and keep an eye on him and y'all will make sure he gets to any doctor appointments the judge may order so that he's never left

out of someone's sight?
**A.** Yes.
**Q.** Will you do that?
**A.** Yes, I will.
**Q.** And if you see him with a glass of beer, will you call the authorities?
**A.** Yes, I will.
**Q.** And if you see him with a firearm, will you call the authorities?
**A.** Yes, I will.
MR. PANNITTO: I have no further questions.
THE COURT: Any cross?
MR. MORRIS: No, your Honor. Thank you.
THE COURT: Thank you, ma'am.
And there's some Kleenex on the stand, too, if you need it.
Can you raise your right hand for me, please?
(Witness sworn.)
THE WITNESS: Yes, I do.
I'm just cold.
THE COURT: All right. I'll make sure I keep distance from you.
Make sure you speak into the microphone for me.
THE WITNESS: I've just got a cold.

LATRENA LAMPKIN, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. PANNITTO:

Q. Could you please state your name?

A. LaTrena Lampkin. I'm sorry. Yeah. I got sick.

Q. LaTrena, you've got a cold or --

A. No. I just got cold in this -- here and it's affecting me. I apologize. It's LaTrena Lampkin, L-a, capital T-r-e-n-a, Lampkin, L-a-m-p-k-i-n.

Q. And, LaTrena, do you know Scott Gann?

A. I do. We met previously about three years ago, and we got reacquainted within the last probably eight to ten months.

Q. And in the time that you've known him, how would you describe his character?

A. A big teddy bear. Literally, he's enormous in size, but his heart is very genuine.

Q. Would you describe him as a quiet person?

A. No, nowhere near. We're both loud and very passionate people.

Q. Have you known him to -- have you ever been afraid of him?

A. No.

Q. And you've been in his presence a lot?

A. Yes.

**Q.** Do you think you have the ability to control him when -- when you talk to him?
**A.** I am his calming person. I can calm him down. Normally, I don't have any -- he -- he'll listen, okay, LaTrena, okay. He knows when certain -- use certain words -- I'm very straightforward and direct, so I have keywords that say, look, now we not going that route or something of that nature. And he'll go, okay, okay, so he backs down really quickly.
**Q.** And he's -- you've been talking to him during this whole business with his house, right?
**A.** Correct. Because I work for the attorney as well.
**Q.** And he's obviously upset --
**A.** Yes.
**Q.** -- with what is going on?
**A.** Yes.
**Q.** Could you describe for me what your thoughts are on that?
**A.** Well, Mr. Gann -- originally, when he was notified of what was going on with everything, he -- he was very passionate about everything that was within his house and how long he had had his home and his friendships that he had gotten over the 25 years of being in Parker, Texas, and how he, you know, loved his daughters. One was in, I believe, Kansas and the other one is at the

University of Texas, I believe.

And he was just outright saying that the things that were going on weren't correct and things like that. And as I was working the case, I started researching things and found very valuable information that was not being shared in his previous cases.

**Q.** So in your opinion, were things -- was he wrong or did he -- could he have a belief he was wrong?

**A.** Well, evidence shows that there is some discrepancies that should be allowed into the case that have not previously been disclosed. And we had requested those and then there was the government shutdown. So that caused a lot of ruckus.

**Q.** So going back to your experience with him, you've never seen him with a firearm?

**A.** No, never.

**Q.** You've never seen him threaten a person?

**A.** No.

**Q.** And you --

**A.** I've seen him agitated, but no -- no threats.

**Q.** And describe his agitation. Is he -- do you think he'd ever act on any of it?

**A.** No. A lot of it is just venting. I was a go-to person to vent to and here -- he believed he had that in Bebe, as he states, which I've never met, or the chief.

He felt that he could vent to them and -- and they would understand his passion for his home and his children and the items within his home.
Q. Now, you'd heard what I had told the defendant's sister and fiancée. Are you agreeing -- do you live close to the fiancée where he'll be staying?
A. I live within ten minutes. We're all -- we're basically on the same street.
Q. Are you agreeing to help make sure that Scott is never left alone unsupervised --
A. Correct --
Q. -- if that were a condition?
A. -- and I've visited her home before previously. So I -- yes, I have no issue.
Q. And if the Court order recommend he do some type of counseling or treatment, would you make sure he got to that?
A. Definitely.
Q. And if you saw him with any alcohol or firearms, would you call the authorities and let them know?
A. Immediately.
MR. PANNITTO: I have no further questions, your Honor.
THE COURT: Any cross?

**CROSS-EXAMINATION**

**BY MR. MORRIS:**

**Q.** Did he ever threaten or state to you that he was going to threaten or hurt the judge, Judge Mazzant, in this case?

**A.** No, not Judge Mazzant. He was -- he was very -- venting on how he knew the judge from Baylor 37 years ago. And he just told me the story about that. He never said anything. He just made it known that they did not -- they were at a party where there was an incident and some people got killed.

**Q.** Did he ever make any statements to you that he was going to threaten or hurt the receiver in this case?

**A.** No. He vented that he was upset about her to going in and taking her possession more than twice because I was on the phone with him on December 17th. And I was on the phone in October when she violated the stay order that was issued by Judge Mazzant and put on file with the courts. And the receiver, as well as -- let me get it correct -- Travis Cross and Mr. May. Mr. May was on furlough and was not supposed to even be doing any type of government -- during the shutdown, but yet he would receive calls from Mr. Travis regarding the -- that the -- property and things.

And one day Scott was just, like, crying, and

he was driving. I'll never forget. And he's like, I can't believe my house. And when he was just passing -- he didn't go on the property. He was in his car passing the house. And he was talking to me, and he said, "Oh, there's people taking stuff out of my house." I said, "How can they be taking stuff out of your house when we have a TRO that we've been trying to enact?" And he's like -- and then he called the Parker Police, and they came onsite. And he was talking to the Parker -- he never walked on the property at all. He was in his car the whole time. So I know that for a fact because I was on the phone with him.

**Q.** You said the defendant called you on 12/17. What time did he call you?

**A.** It was at 2:00 o'clock. It was at 2:00 -- it was at 2:00-something.

**Q.** And did he tell you that he was going to be in South Dallas at Ray's buying ammo and mags?

**A.** No.

**Q.** You didn't know about that?

**A.** No.

**Q.** Did you know that he was heading up to Parker?

**A.** No.

**Q.** When you said --

**A.** Because I was, in fact, in Fort Worth when he

called me. I was in Fort Worth at Ashley Stewart on Berry Street. I could tell you exactly where I was when he called me.

**Q.** And did he make any -- any threats about anybody in this process to you where you had to calm him down and, in your words, tell him that we're going to go take a different route, different path?

**A.** I don't know what my exact words -- but it sounds something like, hold up, calm down, we're going to take a different route. That sounds like something I would tell him.

**Q.** That's your response?

**A.** Yes.

**Q.** But was any of your response to his threats towards anybody?

**A.** I don't think it was threats. I think it was more him venting that he had just found out because that day was a celebration day for him. He had had a great day the day before.

**Q.** Let's not talk about whether it's threats or not, but what exactly did he say to you?

**A.** Well, in order to say it correctly, there were no threats. There was imminent danger nowhere near it. He was venting, sir.

**Q.** What was the statement he made to you?

**A.** I don't remember. I don't recall exact statements.
**Q.** Can you give the judge a gist or a summary of what that statement was?
**A.** I don't -- I'm not going to sit up here and falsely purgerize myself on the stand. That's not -- I can't say exactly. But what I did say -- I can say that what you said about me saying calm down -- because at the same time, when he did that, I walked out of the store I was in because I wanted to talk to him. I got in my vehicle and said, "Hey, we're not doing that today, Scott. We're not doing that."
MR. MORRIS: I have no further questions.
THE COURT: Any redirect, Mr. Pannitto?
MR. PANNITTO: No, your Honor. Thank you.
THE COURT: All right. Thank you, ma'am. You can have a seat. I hope you feel better.
Any other witnesses?
MR. PANNITTO: No, your Honor.
THE COURT: Did you want to say something?
MR. PANNITTO: Well, I'm assuming you're going to say any closing statement. We'd rest.
THE COURT: Okay. You rest.
Okay. All right. Any closing statements before I rule? It's optional.
MR. MORRIS: Subject to any questions, your

Honor, none.

THE COURT: Okay.

MR. PANNITTO: Your Honor, briefly.

THE COURT: Yes, sir.

MR. PANNITTO: There's no question it was a very bad situation both ways. He feels he was wrongly dispossessed and didn't get a chance to fight it through the courts. He called the chief and said things about the person who went to his home and took his possessions -- in his mind, his daughter's life -- you know, life, his family heirlooms from the place that he valued more because of the life he lived leading up. He didn't have a stable place. He was the son of a brigadier general and he moved around a lot.

He found his home. He was there 25 years. He built his house basically from scratch. He designed the pylons. He's built it the way he wanted. Judge, he's a -- he's a son. He's a father. He's a brother. He's a member of his community. The people who talk about him, who know him from the community, don't say anything bad about him, don't say he's a violent person, don't say they're afraid of him or that he totes guns and threatens people. This was a bad situation. It was obviously not good communication and people seeing things different ways.

But the sole question is whether there's clear and convincing evidence that there's no reasonable conditions that can ensure the safety of the community. And I put to this Court that there are -- we have three third-party custodians. People who are going to make sure he's never left on his own. The Court could ask for home confinement. He's confined to his home. He can't go anywhere else. If the Court felt that he needed some kind of mental health treatment, which, you know, might not be a bad idea to have him evaluated based on some of the statements he made, one of his friends or family will make sure that he's brought to that.

Judge, there was alcohol mentioned. There were firearms mentioned. Those could be taken away. He could -- he could have a condition where he doesn't drink. He could have a condition where he doesn't possess firearms. Judge, I believe that there are conditions that could reasonably assure the safety of the community. I don't think his appearance in court is any issue. He's here, all his family's here, he's not running. For those reasons, I'd ask that you release him on conditions.

THE COURT: Okay. I'm not going to really discuss the merits of the complaint and the back and

forth on that. What I'm looking at is a receiver was appointed on the civil side. When a receiver is appointed, that almost inevitably means that the person is not complying with some kind of final judgment. By that very nature, that person needs to receive some assets and sell them to satisfy that judgment. You can avoid a receivership by complying with the final judgment and paying the amount owed.

So the fact that a receiver was appointed and involved tells me or indicates there was no compliance with the final court order of some sort. Then there was testimony that on July 12th of last year, he was ordered to remove -- be -- vacate the property, that was not done.

Then, again, on September the 16th, the Parker Police Department and the United States Marshal's Office got involved and had to physically remove him from the property that he was previously ordered at least one time to vacate. And he was given a trespass warning. Despite that trespass warning, the testimony indicates that -- I believe that he returned at least one more time. So we've got -- one, two, three -- perhaps four instances of failing to comply with some order of the Court, plus taking judicial notice of the bond report. Mr. Gann was convicted in 2022 of evading

arrest or detention with a vehicle or watercraft and then another instance of a violation of a bond or protective order. Although, the bond report says that was a lesser included for some kind of -- or an agreed disposition for another charge.

I will agree there are conditions. I will disagree that he will follow the conditions. I don't have any evidence before me at this hearing that when a Court sets certain rules and conditions that he will follow them. Therefore, I have no confidence that if I issue conditions of release, that will all of a sudden be followed now. So with that, I'll grant the motion for detention and detain him for further proceedings.

Let's address now the attorney issue and the payment, okay? Because I know the government wanted to circle back on that. So Judge Bush, kind of, kicked that, I think, to me. And there was some discussion previously that he could not afford to hire a lawyer, but -- but I think the government's position was he did have the ability to do so.

What's the government's position now?

MR. MORRIS: Just to clarify, your Honor, we didn't take a position. We were --

THE COURT: Okay.

MR. MORRIS: -- pointing out discrepancies to

the Court. We don't object to FPD being appointed. He has the right to counsel. What we were simply saying is between his financial affidavit that he's filled out, pretrial services report, and the requirements statutorily that he be eligible for FPD, there just appears to be misalignment there. And we would point out, you know, as an officer of the court for that determination. There are ways -- obviously, the benefit of the doubt is -- leans heavily in his favor for this. There are ways later that he could be charged for it. But there are just things that don't add up, and as an officer of the Court, the government simply just points that out.

I can go into the specifics of what those are, but, again, very clearly we're not objecting. We're just simply stating discrepancies that we see.

THE COURT: Okay. According to the pretrial report, he does have significant assets, but either he himself is reporting or someone else is that he doesn't have access to it to pay for any attorney. So unless his circumstances change, I'll continue the Public Defender's Office appointment and not change my mind on that and just keep the status quo until -- unless and until someone else brings something up that it's an issue. Of course, he's always free to hire his own

counsel if he wishes to the extent that he can afford that.

Anything else further from the government?

MR. MORRIS: No, your Honor.

THE COURT: Anything else further from the defense?

MR. PANNITTO: No, your Honor.

THE COURT: All right. I'll remand you to the custody of the United States Marshal's Office for further proceedings.

THE DEFENDANT: Your Honor, I'm sorry. My attorney is telling me not to say a word. Can I please have two minutes?

THE COURT: I don't think you should say a word, but -- and you --

THE DEFENDANT: And you just said something --

THE COURT: Time out. Time out.

THE DEFENDANT: I'm sorry.

THE COURT: Law enforcement is here, the prosecutors are here, all this is being recorded, and it can be used and will be used against you.

THE DEFENDANT: Yes.

THE COURT: Your lawyer is telling you not to say anything. So everyone, including the judge, is

saying don't say anything, okay? There's nothing you're going to tell me that's going to change my mind. Let me repeat that. There's nothing you're going to tell me that's going to change my mind.

You're perfectly capable of appealing my decision to the district judge. If you feel so strongly that I did -- what I did was wrong, it's okay. You just appeal that to the district judge. That's how you handle it. I highly recommend you don't say anything in court, okay?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Anything else further, Mr. Pannitto?

MR. PANNITTO: No, your Honor. Thank you.

THE COURT: I'll remand you back to the custody of the United States Marshal's Office.

(Proceedings concluded at 1:01 p.m.)

* * *

COURT REPORTER'S CERTIFICATION

I hereby certify that on this date, June 11, 2026, the foregoing is a correct transcript from the electronic record of proceedings.

APRIL D. HARGETT
Certified Realtime Reporter
Eastern District of Texas
Beaumont, Texas